### L. H. GILMER CO. v. GEISEL.

(Circuit Court, E. D. Pennsylvania. November 29, 1910.)

#### No. 235.

PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—BELTING.

The Gilmer patent, No. 723,379, for a belting, claim 7, which was added by way of amendment and is a much broader claim than the others and than the device described in the specification, if valid at all, in view of the prior art, cannot be construed to cover the device of the Geisel patent, No. 726,670, which was invented pending Gilmer's application and was known to him before he added such claim. Also, *held* not infringed by such Geisel device if conceded validity.

In Equity. Suit by the L. H. Gilmer Company against Otto Geisel. On final hearing. Decree for defendant.

Decree affirmed by Circuit Court of Appeals. 187 Fed. 941.

See, also, 168 Fed. 313.

R. W. Barrett and T. R. White, for complainant.

Frederick J. Knaus, for respondent.

J. B. McPHERSON, District Judge. On February 12, 1902, L. H. Gilmer applied for a patent upon improvements in belting—after-

wards numbered 723,379—his main object being to provide a flexible joint uniting the ends of belts made from woven fabrics. He did not at first satisfy the examiner that his invention was valid, and on August 12th he was obliged to restate his claims. These constitute now the first six claims in the patent as finally allowed:

"1. A flexible belting having its ends raveled and sewed together, and means for surrounding the ends of the belting and sewed thereto so as to form an integral mass.

"2. A flexible belting having its ends raveled and sewed together, a strip of braiding surrounding the ends transversely, and a series of longitudinal stitchings to secure the braiding to the belting and extending beyond the edges of the braiding.

"3. A flexible belting having its ends raveled, a series of transversed stitchings sewed upon the joint made by the raveled ends, a strip of braid surrounding and lapping over said joint, and longitudinal stitchings to secure the braid to the belting.

"4. A flexible belting having its ends raveled, transversed stitchings securing said raveled ends together, and means surrounding said joint, and sewed thereto so as to be substantially the same thickness as the body of the belting.

"5. A flexible belting having its ends raveled, transversed stitchings securing said raveled ends together, a band of braid surrounding the joint so formed, and longitudinal stitchings connecting the braid to the belting.

"6. A flexible belting having its ends raveled, a series of transversed stitchings connecting the raveled ends and reducing their thickness to that of the body of the belting, means surrounding the joint so made, and longitudinal stitchings passing through said means and beyond the same on the belting to reduce the joint to substantially the same thickness as the body of the belting."

On August 23d, without suggestion from the office, his attorney added claim 7 as an amendment; no supplemental oath being made to this additional application:

"7. A flexible belting having its meeting ends unraveled, transverse stitchings securing the unraveled ends together, and longitudinal stitchings across the joint so formed: said transverse stitchings preventing transverse stretching of the belt while the longitudinal stitchings prevent longitudinal stretching of the belt."

This eliminates the element of a braid or other means surrounding the joint, and is a much broader claim than the others. The reason for this amendment lies in the following facts: Before March 25th Gilmer had learned that the defendant, Geisel, was making and selling a flexible belt whose ends were united by a joint that differed in certain respects from his own. He believed it likely to compete, and, having so advised his attorney, the latter wrote to Geisel on March 25th threatening a suit for infringement. With the direct purpose of anticipating the Geisel joint—with whose details Gilmer was familiar—claim 7 was added on August 23d, and the seven claims of the patent were finally allowed on September 23d. The fees were not paid, however, until March 3, 1903, and the date of issue is March 24th. Meanwhile on November 4, 1902, Geisel had filed his application, and this was promptly allowed on December 4th, without reference by the office to the Gilmer device or to any other structure in the prior art. The patent was issued on April 28, 1903, and is numbered 726,-670.

The methods of manufacture adopted by Gilmer and by Geisel, respectively, are described in their specifications. Gilmer's description is as follows:

"This invention relates to improvements in belting; and the main object of my invention is the provision of a connection for a belt to be used where a very flexible connection is desired, as upon machines of very high speed—such as jewelers' lathes, routing-machines for lithographers, or, in fact, any machinery where a joint for the belting is desired to be made as flexible as the body of the belting itself—thus insuring the proper transmission of power and preventing the belt from leaving the pulley.

"Another object of my invention is the provision of a flexible joint for fabric belts or belting which is very simple, durable, and inexpensive in construction and thoroughly efficient and practical in use.

"To attain the desired objects, my invention consists of a flexible belting having a novel form of coupling, substantially as disclosed herein. * * *

"Referring to the drawings, A designates one end of the belting and B the other; the said ends of the belting being cut at a right angle to its sides. These ends are placed together, as shown in Fig. 1, and stitched with the peculiar transverse stitching, C, so that the raveled ends are practically unobservable. Adapted to be placed crosswise of the two meeting ends of the belting is a strip or band of braid or other suitable material, D, which is adapted to be held to the belting by means of the longitudinal stitchings, E, which extend some little distance beyond the sides of the braid and are so closely made as to substantially weave the braid within the body of the belting. Thus it will be seen that by the placing of the braid in this manner and stitching it so closely to the fabric a comparatively thin and flexible joint is formed.

"In the modified form of my invention I cut the ends of the belting on the bias, as at F, and place the raveled ends closer together. Two strips of braid, G, are then placed over the outer edges of both ends, and by means of the longitudinal stitching, H, the strips of braid are securely fastened to the belting, and, as said stitchings extend up and down across the entire body of the ends, the meeting ends of the belting are reduced to a size substantially that of the belting itself.

"It will thus be seen that by this construction of joint a very strong, flat, and flexible connection for belting of this character is provided and one which will readily yield and accommodate itself to various pulleys of high-speed machines, more particularly, however, for routing-machines and all high-speed machinery. By making a connection of this kind for belting the cost is very much reduced, both as to material and labor, and a very simple form is provided, thus rendering the invention thoroughly efficient and practical."

Geisel's method is thus described:

[1] "In high-speed machinery, such as routing-machines and the like, where belting is used to transmit the power from a large wheel to a very small pulley, an exceeding flexible belt is required, and therefore it has been found by experiment that a web or woven belt answers the requirements; but it has always been a difficult problem to join the two ends of the belt so as to withstand the high speed at which it is caused to travel. Of course the two ends of the belt could be overlapped and stitched together; but this would cause a double thickness at the joint, which would be a detriment to the belt.

"My method consists in preparing the two ends of the belt to be joined as follows: Each end of the belt is slit, as indicated at A, from the end a short distance into the belt and in the middle thereof. Then a cross-slit, B, is made from one side into the belt until it meets the slit A, thus removing one corner. Then a cross-slit, C, is made in the belt from the same side as the slit B, and then in the middle of the belt a longitudinal slit, D, is cut from the slit C a short distance into the belt away from the end. Then the longitudinal threads between the slits C and B are removed, leaving the cross-threads exposed, as represented. Then the cross-threads are removed from that portion of the belt inclosed on two sides by the slits D and C, thus leaving the longitudinal threads exposed, as indicated at F. Then the cross-threads are removed from the end of the belt between the removed section and the side, leaving the lon-

gitudinal threads exposed, as indicated at G. The other end of the belt is prepared in the same manner, except it is reversed, and the corresponding parts in this other end are lettered E', F', and G', respectively. In joining the two ends the shredded portion, G', is passed through the slit C, so as to lie underneath the shredded portion F, and the shredded portion E' will come over the solid portion H of the opposite end of the belt, and the shredded portion E will come under the solid portion H' of the other end, and the shredded portion G will pass through the slit C' and lie above the shredded portion F'. Thus there will not be any portion of the joint where two solid portions of the belt come against one another, and in this way the thickness at the joint will not be materially increased. After the two ends are placed in this position the joint is coated with cement or like substance, and then it is stitched through and through, as illustrated in Fig. 2. The belt is then joined strongly and its flexibility has not been damaged to any great extent.

"To protect the joint and stitches, a thin coating of rubber, I, is vulcanized upon each side of the joint, as illustrated in Figs. 3 and 4, and this will protect the stitches from being worn in traveling around the pulleys.

"Of course the two ends of the belt could be laid one over the other, if desired, without passing the portion G and G' through the slits C and C', but by doing it in the manner described a stronger joint is formed.

"I am aware that web belts have been joined before by shredding a portion of each end of the belt; but a joint has never been made whereby portions of the belt were shredded so as to leave longitudinal threads and the portions threaded so as to leave cross-threads and so shredded that no two solid portions would come together at the joint."

Although Gilmer was familiar with Geisel's device as early as March, 1902, and although both applicants patented their joints before May, 1903, this suit was not brought until February, 1909, nearly six years afterwards.

The plaintiff concedes that Geisel does not infringe the first six claims of the Gilmer patent. This is obvious, for one element of each claim is a supporting braid or something similar around the joint in order to protect it from lateral stretching. But this element was speedily given up. The use of braid was found to be objectionable, because the joint was thickened thereby in the same manner as by lapping the ends of the belt, and the braid was therefore abandoned almost at once, and the joint was strengthened laterally in a different manner, namely, by oversewing the edges as a buttonhole is sewed. And this oversewing is still an essential part of the joint, although claim 7, the only claim now in dispute, does not call for it; the sufficient reason being that the joint will fray out and will therefore not be operative unless the edges are protected in some such way. In other words, none of the seven claims will work unless a new element is added; thereupon the patentee adds that element and thus obtains an operative joint, and now seeks to enforce the broad general language of the seventh claim because the inoperative device described therein can be read upon the defendant's invention. Considering the history of the seventh claim, I think it must be narrowly scrutinized before it can be allowed to dominate the Geisel patent. Gilmer was far from being a pioneer. He belongs to the class of improvers described in Railway Co. v. Sayles, 97 U. S., on page 556, 24 L. Ed. 1053. Speaking of double brakes, the device there in question, Mr. Justice Bradley said:

"Like almost all other inventions, that of double brakes came when, in the progress of mechanical improvement, it was needed; and, being sought by

many minds, it is not wonderful that it was developed in different and independent forms, all original, and yet all bearing a somewhat general resemblance to each other. In such cases, if one inventor precedes all the rest, and strikes out something which includes and underlies all that they produce, he acquires a monopoly, and subjects them to tribute. But if the advance towards the thing desired is gradual, and proceeds step by step, so that no one can claim the complete whole, then each is entitled only to the specific form of device which he produces, and every other inventor is entitled to his own specific form, so long as it differs from those of his competitors and does not include theirs. These general principles are so obvious that they need no argument or illustration to support them."

In that case also it was attempted to broaden the scope of an original application by amendment, and the court laid down the following rule for such a situation (page 563 of 97 U. S., 24 L. Ed. 1053):

"It will be observed that we have given particular attention to the original application, drawings, and models filed in the Patent Office. * * * We have deemed it proper to do this, because, if the amended application and model filed * * * five years later, embodied any material addition to or variance from the original—anything new that was not comprised in that— such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, which would interfere with other inventors who have entered the field in the meantime, any more than it does in the case of reissues of patents previously granted. Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use."

And this rule was approved in Hobbs v. Beach, 180 U. S. 396, 21 Sup. Ct. 409, 45 L. Ed. 586, although the facts of that case did not call for its enforcement.

With this rule in mind, and considering also the prior art—which is well summarized by the defendant's expert Jackson on pages 325 to 330 of the printed testimony, and therefore need not be again referred to—it is, I think, manifest that Gilmer cannot be permitted to cover the broad field of the seventh claim. For present purposes the specific device of the first six claims may be assumed to be valid, but the prior art so limited his application that it could not possibly support the wide extension sought by the amendment. As already stated, Gilmer's invention was not a pioneer. After he abandoned the braid and took the additional step of oversewing the edges, he produced a meritorious and useful joint; but his success was not due to his patent alone. On the contrary, it was plainly due in a material degree to the substitution of oversewn edges in place of the objectionable braid. The argument from usefulness and success cannot apply to the first six claims, and, if these alone were in issue, it would at once be clear that the patent must be confined to the specific device which they describe. These, however, are admittedly not infringed, and, if the original application could not properly cover claim 7, that claim also becomes ineffective—especially in favor of Geisel for the reason already given. In my opinion, when the prior art already referred to is considered, it is impossible to sustain the broad scope of claim 7, which claims any unraveling, any transverse stitching, and any longitudinal stitching. The defendant's expert has

made it clear, I think, that Gilmer is certainly not entitled to any such claim against the defendant. Whether claim 7 would be valid against anybody may be left for future decision. It is possible that, in view of the prior art, the claim may be saved by limiting its meaning so as to cover only the particular device described. If not so limited, it is void against Geisel, because under the facts in proof Gilmer could not ingraft a broad claim by amendment upon a narrow application, for the express purpose of defeating an intermediate inventor.

In either event, the defendant's joint does not infringe, and for that reason the bill may be dismissed, with costs.