**AUTO RESEARCH CORPORATION et al. v. JACKSON & WEBSTER AVE. CORPORATION.**

No. 348.

Circuit Court of Appeals, Second Circuit.

Aug. 1, 1933.

Williams, Bradbury, McCaleb & Hinkle, of Chicago, Ill., and Pennie, Davis, Marvin & Edmonds, of New York City (Lynn A. Williams, Elwood Hansmann, and Benjamin F. Wupper, all of Chicago, Ill., of counsel), for appellant.

Dean Fairbank, Hirsch & Foster, of New York City (Melville Church and C. B. Des Jardins, both of Washington, D. C., and Morris Hirsch and Harry Price, both of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

This is the usual bill in equity for the infringement of ten patents, all owned by the plaintiff. A list of the patents with the claims in suit are as follows:

Morris, No. 1,227,481, issued May 22, 1917; claim 2.

Bloom, No. 1,632,724, issued June 14, 1927; claims 1 & 2.

Bloom, No. 1,632,767, issued June 14, 1927; claim 15.

Bijur, No. 1,632,771, issued June 14, 1927; claims 8, 34, 39.

Bijur, No. 1,632,772, issued June 14, 1927; claims 10, 22, 28, 29.

Bijur, No. 1,732,212, issued Oct. 15, 1929; claims 1 to 21 inclusive, and 25 to 39 inclusive.

Bijur, No. 1,732,828, issued October 22, 1929; claims 4, 6, 10.

Bijur, No. 1,734,026, issued October 29, 1929; claims 1, 4, 11.

Bijur, No. 1,734,027, issued October 29, 1929; claims 1, 5, 14, 24.

Bijur, No. 1,746,139, issued February 4, 1930; claims 1, 2, 9, 23, 26.

All the patents deal with the control of a general lubricating system for mechanical bearings; all but the first are especially for motor-cars. A description of each, so far as necessary, must be delayed for separate discussion. The plaintiff alleges that all are infringed by the defendant's lubricating system installed upon Nash motor-cars. A brief description of this will serve for all the cases. It consists of an oil reservoir in which is inserted a small reciprocating pump whose plunger operates vertically, and is automatically actuated by a rod extending upwards, whose upper end is connected with a pivoted weight. The unpivoted end of the weight rests upon a spring, which is alternately compressed and released as the car rides over an uneven road. Thus the plunger is moved up and down by the weight, and with each down stroke forces very minute quantities of oil into the general lubricating system, one-thirtieth of a drop at a stroke. Owing to seasonal differences in the thickness of the oil, the resulting pressures vary from three pounds per square inch in summer, to between fifty and a hundred in winter. A screen is interposed in the reservoir to filter the oil before reaching the plunger. The lubricating system proper consists of copper piping branching into many leads, which end at the bearings to be oiled. The pressure must be lowered in different degrees for different bearings, and the members which do this are called "drip plugs." They are made up of a number of parts; a collar or bushing is fitted over the end of the pipe with external threading, a second collar or bushing is threaded upon the first, the lower end of which is threaded into the bearing. A "valve unit" fits within the second bushing and over the end of the pipe; it has a constricted opening at the base, guarded above by a wire mesh filter. Below this opening the "valve unit" expands, and a "check-valve" is set between it and a "screw-plug" threaded into the lower part of the second bushing. The check-valve is merely a loose disc of oiled silk, allowed to float between the lower end of the "valve-unit" and the upper end of the "screw-plug," though the play is very slight indeed. The threading between the outside of the "screw-plug" and the inside of the second bushing is not close; the threads are flattened and a helical passage results, the only communication between the "valve-unit" and the bearing. Through this the oil must pass, and the passage constitutes the impedance, reducing the pressure and the flow. Bearings which need a large supply of oil have a short helix; those which need only a few drops, a

long one. Thus the flow, though under the pressure of a single pump is distributed unequally to the bearings and according to their several needs.

General lubricating systems for motor-cars had existed before the filing date of any of the patents in suit except Morris; as for example, the Fergus system, 1915, the Skelly, in 1919; the Guy, in 1920. The plaintiff's position is, however, that the improvements disclosed in the patents in suit, and especially in the seven Bijur patents, alone made possible any effective system in which a single pump could distribute oil differentially to various bearings, located at greatly different distances from the pump. The judge held that all the claims were valid and infringed and granted a decree upon all. We shall take up each in the order of its issue.

### The Morris Patent.

This system was not for a motor-car, but it disclosed a central pump, forcing oil to mechanical bearings removed at different distances. In each lead which fed a given bearing and near the bearing, was a reservoir, containing a wire screen, designed to act as an impedance and filter. The oil after being so strained, passed to the bearing and after use went back again to the pump. The filters were varied in size according to the needs of the bearing, and the theory was that they would set up a resistance proportional to that size and those needs. As the screens filled with dirt, the pressure on the pump increased, but the relation of the feeds to the different bearings was preserved. The only claim in suit, No. 2, is as follows: "In mechanism of the class described the combination of circulating means, a plurality of conduits connected thereto, and flow impeding elements in each of said conduits, said elements being adapted to maintain their relative resistance capacities, while increasing their individual resistance capacities." A disclaimer, filed after suit brought, further limited this to a combination "when said flow-impeding elements have diverse relative resistance capacities, maintained in such relative diversity as to be proportionate to the requirements of the bearings served thereby."

The claim, with or without the disclaimer, cannot cover the supposed infringement. Read without regard to the disclosure, something could be said, but it is scarcely necessary to say that no claim can be so read. The plaintiff's position is that no one before Morris had ever conceived the idea of impeding the flow of oil in a general lubricating system by devices placed near the bearings,

and so proportioned as to give a differential feed; and that the patent in suit which contained this new element is entitled to a construction as broad as the idea. Bangs, No. 640,079, disclosed a general system of lubrication, but did not show differential impedances for the several bearings, though this might have been easily accomplished if there had been any need. Manzel, No. 827,301, disclosed a lubricating system for locomotives. A complicated system of pumps, arranged for varied feed, drove the oil through a series of pipes to the bearings. In some cases only one bearing was fed by a single pipe; in others several. At the "chest-plugs," where the end of the lines were tapped into the bearings, were reducing devices, "choke-plugs," with constricted openings designed to diminish the pressure and flow of oil to the bearing. Below these were spring check-valves; above them strainers. The flow of oil could be varied by changing the size and aperture of the "choke-plugs," but the disclosure does not suggest that the different needs of several bearings should be so accommodated. Rather the feed was varied by changing the speed and stroke of the plunger in the cab of the locomotive. Thus, while the idea was present of varying the pressure and flow to the bearings, the means used by Morris was not. The added element is of doubtful sufficiency for an invention, and we do not hold that merely to vary the plugs for different needs would have supported a patent. However we will assume arguendo that Manzel was not an anticipation of the broad idea. At any rate, it was present in Emmet, No. 869,138, and Mille, No. 992,229. We shall have occasion later to discuss Emmet's patent more fully, and it is enough here to observe that it was a central lubricating system, or series of such systems, for turbines, in which the pressure and flow were greatly varied by impedances, set in the supply pipes not far from the bearings. Mille showed quite another sort of lubricating system, in which the feed pipes were siphons leading from a common reservoir which was filled by a pump. Each pipe was provided at the end with a drip plug which could be changed to regulate the flow required by the bearing to be fed. It is true that the oil was dripped out upon the bearing, but there is no distinction in that; the force of the pressure and with it the flow depended upon the head in the siphon. There was thus a common source of pressure which was distributed to the several bearings according to their needs by differentiated impedances set close to the bearing.

Thus, Morris's claims cannot survive the extension of their terms so far beyond the particulars disclosed. We have no reason to doubt their validity when read with reasonable limitation, but to allow him a general monopoly for the generalized idea of any lubricating system containing the elements we have mentioned, would fly in the face of the art. It is only by so doing that infringement can be made out; we reverse the decree as to this patent.

### The Bloom Patents.

These are two patents, one for a system of lubrication for motor-cars; the other for the plugs which immediately feed the bearings. The system comprised a reservoir which drained to a cylinder, which in turn was emptied by the plunger of a manually operated pump. The forward stroke forced oil into a general lubricating system, any return to the cylinder being prevented by a check-valve. The system branched out into various separate lines, leading to the several bearings. At the end of each line was a choke plug, through which a minute linear opening emptied upon the bearing. For present purposes it is not important whether the feed was in part by flooding the bearings on the forward stroke of the plunger, or by the shaking of the car, or by both. The openings in the choke-plugs, or fittings, were described as capillary in size, so small as to prevent the entrance of air into the system, but this is not a feature shared by the defendant, any more than the feed by shaking. Claim 15 of the first patent was for the general system; claims 1 and 2 of the second, for the plugs. All three claim feeds, graduated according to the needs of the bearings.

The contribution of Bloom over Morris's general idea was therefore in the form of the choke-plug or fitting. His plugs were somewhat similar to Manzel's though Manzel's openings were not linear or capillary in size. They were not like Emmet's, from whom the defendant borrowed. In addition to these references, the art between the applications of Morris and Bloom had developed other devices for regulating the flow of oil to bearings of different needs. Thus Lemp and Stock, No. 1,257,258, showed a plug with a passage partly occluded by a pin, much like some of Bijur's later forms. The pins could be changed so as to vary the resistance of the plug. The patent was not indeed for a motor-car, but that makes no difference. Skelly, 1,326,142, was, however, specifically for motor-cars, and showed constricted noz-

zles, each of a size proper for the needs of the bearing which it fed. The plaintiff objects that there was no common lubricating system, and the main disclosure was indeed of a separate pipe for each bearing. However, an alternative form disclosed a main lead with branches in which the nozzles were varied in size for a "more or less selective" lubrication as required by the different bearings. In this form a check valve was set behind each nozzle. We cannot subscribe to the argument that this was not a disclosure of a central lubricating system with differential feed for each bearing. The patentee did not apparently think it very serviceable, but he plainly disclosed it for what it was worth, and while of course it was not an anticipation of Bloom's plugs, it went to circumscribe the scope of his invention. Litle, 1,490,423, was another lubricating system for motor vehicles, operating this time by gravity. It was for a central piping system, terminating in branches at the bearings, and all under a single pressure. The important element was the control of the feed at the bearings, which was by obstructing the openings by means of wires, or cotter pins, the flow varying with the extent of the obstruction to comport with the several needs.

Thus the case stands as to Bloom's patents as it did as to Morris's. The underlying idea, so far as the defendant took it, was an old one in the art; there had been central lubricating systems before, driven by a single pump, terminating at the several bearings, at or near which were impedances which regulated the pressure and flow to the needs of a particular bearing. The form of these had indeed varied much; so had their supposed operation. But the defendant took none of these except Emmet's, and the claims can cover its structure only in case we extend them to a pattern which we can indeed find in the disclosure, but so bereft of all particulars as to impinge upon the prior art. We hold these patents not infringed.

### Bijur Patent 1,632,771.

The disclosure in this patent was of a lubricating system like that of Bloom, differing however in the pump, the choke-plugs or fittings, and the check-valves. The system being once filled with oil so that all air was excluded, the driver, for instance at the beginning of a day's run, would manually draw back the plunger of the pump, against the pressure of a spring. When he let go, the plunger under the compression of the spring was forced against the column of oil, setting up a constant pressure throughout the whole system, except as it was diminished by friction, which continued until the spring was again fully extended. Thus the spring slowly forced the oil through the fittings into the bearings. The fittings were all of a kind, a straight bore through a solid plug, partly filled by a pin fitted within it. The more nearly the pin occupied the whole bore, the greater the resistance. When the flow was to be small, the pin must be large, and vice versa. To prevent the leakage of oil out of lower fittings, by siphoning, check-valves were set at the discharge end of the bore; these consisted of discs of oiled fabric held in place against the lower end of the opening by a spring, whose compression must be overcome by the pressure of the pump to feed the bearing.

Again the possible scope of the claims is limited by the prior art. As these patents are the plaintiff's chief reliance, we may go back to the beginning of lubricating systems for motor-cars. The Fergus system of central lubrication was the first. The pump there used was the engine; the lubrication was general, that is, in a single branched system, but the feed was apparently differentiated only by friction, the further bearings in this way getting somewhat less than those nearer the head of the intake. This was in 1915; it was apparently only a crude device. Skelly's system of 1919 was the next. We have already discussed it; the alternative form provided for a differential oil feed, very different in detail from Bijur's, but in outline like his. The preferred form went into some use, but not the alternate, so far as appears. The Guy system of 1920 was the next; this had an intermittent pump operated only when the wheel was put over hard to the right, and a central piping system, ending at the several bearings. The evidence is too scanty to say that the pipe endings were restricted to accommodate to the needs of each bearing, though that result was claimed, and probably accomplished in that way, aided by the use of wicking. Possibly it was not a serviceable system, and it was not of course an anticipation of the later systems, but it served to pave the way. Though Litle, 1920, had no pump, for as we have said, he depended on gravity, he did have a central system, and his fittings were modified each to serve its bearing by means of devices very similar to Bijur's. Again, the general plan was disclosed.

Thus, when Bloom filed his applications in May, 1922, a few months before Bijur's

earliest application in the following August, the art was familiar enough with the underlying ideas of such a system and had already perfected some forms. Bloom, as we have seen, again combined an intermittent manually operated pump with a central system and a differential feed by graduated openings in choke-plugs close to the bearings. He did indeed have no check-valve for the reasons already given, but save for these, Bijur was necessarily confined to the details which he introduced into his multifarious disclosures. He claims that he made a departure in that Bloom relied upon his system's being partly full of sub-atmospheric air, and that the charge of the pump occupied this space. Bloom's original specifications distinctly contemplated that a stroke of the pump would flood the bearings, and in general reads as though the system was completely full of oil. He certainly intended to exclude all air from the plugs, and so far as we can see from the whole system. It is true that he also spoke of the oil as being only shaken out by the motion of the car, but he apparently meant that this occurred after the stroke had flooded the bearings and while the car was moving. In any event if the exceedingly uncertain terms of the original application be enough to make out the operation as the plaintiff would have it, it was no more than a supposed improvement, which Bijur and the defendant were free to disregard if they chose. There is no suggestion that the earlier systems were not intended to operate with a system full of oil and Bijur's departure from Bloom, if it was a departure, can give no validity to his invention. His advance must be confined to the details, none of which the defendant adopted. Its pump was not in the least like Bijur's; indeed it was in no proper sense an intermittent pump at all, though it did operate by minute increments of charge. The fittings were not like Bijur's; nor may Bijur depend on the general theory of a fitting "rated" for its bearing. Regardless of the language of the claims, we conclude that this patent was not infringed.

#### Bijur, 1,732,212.

This patent was again for the system as a whole, as distinguished from the fitting. The pump was connected with the brake so as to be operated whenever this was applied. Thus by a series of small increments of charge, the oil was forced into the system. In the original specifications an essential feature was an air-bell, which was to act as an "accumulator," and whose pressure was slowly to feed the system by the compressed air. In the final form the air-bell appears as only optional, ("if required"), and the operation was thus radically changed. This was a divisional application and must date back to the original. Meanwhile Bijur had bought Bloom's patent and before issue omitted some pregnant passages, as we have seen, showing that the system was probably oil filled. This coupled with the change in the divisional application as to the air-bell, is sufficient evidence of the truth of the defendant's argument that Bijur in order to establish a factitious distinction between his own and Bloom's invention, changed his own theory in this regard, and that originally he had no notion of a completely oil filled system. As we have just said, we do not regard this as important, but even if it were, we should hold that it was a later introduction, to which the patent was not entitled against the defendant, whose system had already appeared when the change was made. Webster Electric Co. v. Splitdorf Electrical Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792.

Bijur disclosed several kinds of fittings; the old bore and pin with a spring check-valve beyond it; a flap of metal or leather, acting as a check-valve; and a stuffing box, analogous to that earlier disclosed in the application of Locke and Dosch. Except in so far as the second form may have some bearing upon the check-valve employed by the defendant in connection with its helical feed, it has taken nothing from this patent that was not old in the art. We find that the claims in suit, and for that matter any valid claims which could have been drawn, were not infringed. We reserve for the moment the question of the check-valve.

#### Bijur Patent 1,746,139.

This is the remaining patent for the general system and is chiefly to be distinguished by its pump, which was connected with the manifold intake of the engine, by which it was operated. Like the defendant's, it was not therefore intermittent; but we do not see how infringement can be made out. It was a division out of the heterogeneous mass which formed the original application, and must be limited to the specific disclosures, if it is to be valid at all. The defendant took nothing resembling it that we can find, except as it was already in the art. Indeed even verbally claims 1, 2 and 9 were not infringed; the defendant's pump was not operated by the "lubricated mechanism," which in them

was the engine itself. We hold this patent not infringed.

Bijur Nos. 1,632,722; 1,732,828; 1,734,026; 1,734,027.

These patents are for fittings and check-valves. The defendant, as we have said, used a helical passage for reducing pressure, varied in length to accommodate the final discharge to the needs of each bearing. This was fully disclosed in Emmet's lubricating system for turbines, long before any general lubricating system for motor-cars was devised. Later it was somewhat improved by Junggren, 993,831. Fifty years before Bijur filed his application, it was already a known device for regulating the flow of a lubricant. Barnett & Eckford, 122,427; Ross, 143,422. As is usual, when an old device is put to a new use the patentee protests against the assumption that the adaptation was obvious. That indeed depends upon the facts of each case, but here we have no question, Emmet wished to divide a single column of lubricant to the two ends of a turbine by means of a single pump. Sometimes he had a separate pump for each machine, sometimes he linked several turbines in series to one pump; the problem was precisely the same in each case, because there were always at least two feeds to each pump, one at the base, the other at the top, of the turbine shaft. Turbines may weigh tons, and yet to revolve upon their shafts the oil must be forced beneath them with enough pressure to lift them from their seats. The top of the shaft needs nothing of the sort; it revolves within one or more guides. So it was necessary if one pump was used, to reduce the pressure at the upper guides very greatly, but keep it exceedingly high at the base. Emmet resorted to a helical reducing device for this purpose; so did Junggren. The problem to be answered was precisely the same as in the case of a central lubricating system for a motor-car, except quantitatively; it was to change a constant pressure from a single source to varying pressures at bearings with different needs. It is no answer to say that the diameter of the helical groove was the same as that of the pipe, were that true, or that it was some distance from the bearing. Nor did the back pressures of the turbine make a difference; at the guides these pressures were "very small" (page 1, line 39), due to the "accurate balancing of the rotating parts." Besides, the language in Emmet's specifications relied on to show that the helical passage was of the same area in cross-section as the pipe is far from establishing that fact, if it were material, which it is not. The passage is not to be "throttled or wire-drawn" and is to be "nowhere contracted," but this is consistent with a uniform passage of less area than the pipe. No doubt the passage could be made in either way. The relevant point is that exactly the same device was used for exactly the same purpose in a closely related art. We conclude that by no claims in any patent, could the helical passage used by the defendant be monopolized when used to reduce the pressure and flow of oil to a bearing of any kind.

This limits the consideration necessary to the four patents to the check-valve employed by the defendant. The same question also arises as to No. 1,732,212, which we reserved above. As we said at the outset, this was a loose disc of oiled silk interposed in advance of the helical passage, and designed to prevent seepage of oil, especially in the lower bearings through which it might otherwise siphon out. There had been spring check-valves set at the same place before; for example, in Skelly. Bijur disclosed six sorts in his original application; one of these, Fig. 29, was a combination of a check-valve and an impedance, of which the valve closed the pipe, when no oil was being forced through, but opened under pressure. It was the nearest to the defendant's valve of any, and if the claims for it are not infringed, there is nothing better. This valve was originally described according to the figure and nothing more was said about it. One edge of a leather or steel disc was clamped between the end plug and a ledge in the cartridge into which the plug was inserted. Below the disc was also clamped a bowl, which we apprehend to be the impedance in this fitting. In operation the oil pressed the free end of the disc downward, allowing the oil to come out; afterwards the valve "automatically seats" itself, preventing the entrance of air. In the case of a steel spring the reseating was certainly from the resiliency of the metal. To a lesser degree this would also be true of leather, though how much did not appear. In 1927 Zerk applied for a patent on the loose, i. e., floating, valve, which the defendant had begun to use at least as early as 1926. The divisional application for Bijur's patent, 1,734,027, was applied for in June, 1928, in which the valve was then repeatedly spoken of as "loose," and the leather form as not depending upon its resiliency. In No. 1,732,212, the leather is said to be seated only by a "return impulse," and as devoid of any re-

siliency. Nothing of the sort was suggested originally; no return impulse was mentioned; the valve was not described as "loose," and was not loose. The later effort was to introduce a new motion, not mentioned before and after Zerk had conceived of quite another sort of valve. Claims based upon such attempts are not valid. Webster Electric Co. v. Splitdorf Electrical Co., supra, 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792.

Thus Bijur got no monopoly upon a "loose" check valve, properly so called; on the contrary, he never conceived of any such. Flexible valves attached to one edge were not unknown in the prior art. Spencer, 555,-588; Lott, 670,794. His original disclosure coupled leather with steel indistinguishably, and there is no basis for supposing that he meant that a truly "loose" valve would serve. His claim must be confined to his disclosure. Indeed, we should not in any event be disposed to enlarge by implication disclosures which are so multifarious and so specific. Bijur was indeed entitled to show as many new fittings and valves as he had invented; the combinations between them may have all been valid patents; if each was a separate invention, a patent upon it covered its employment in any system. But they must be strictly limited, especially since Zerk's loose valve, whether it operated by return pressure, or capillary attraction, or both, had meanwhile intervened. The art got from Bijur no cue to let the valve float between the pipe end and the fitting.

We conclude that none of the patents are infringed. Bijur's invention, that is, one of the many covered by the industry of his solicitors, has had indeed a substantial acceptance, though even so, only a very small fraction of the industry has adopted it. But it would be gratuitous to ascribe his success to the factors common to him and the defendant. The general outlines of a central lubricating system were in no sense due to him; he merely perfected details of what his forerunners had begun. The defendant took nothing from him of these details, and we will not be drawn away from the essentials by a labyrinth of claims couched in the customary confusion, and spreading their web to catch all that may fall within their abstract verbiage. We agree with the defendant that the plaintiff should not have been allowed to withdraw any claims at trial. All those which remained in suit when the trial opened will be held not infringed.

Decree reversed; cause remanded with instructions to dismiss the bill for non-infringement.