**AKRO AGATE CO. v. MASTER MARBLE CO. et al.**
**No. 119.**

District Court, N. D. West Virginia.

Jan. 16, 1937.

Clarence D. Kerr, of New York City, John S. Stump, Jr., of Clarksburg, W. Va., and Robson D. Brown, of Hartford, Conn., for plaintiff.

Toulmin & Toulmin, of Dayton, Ohio, and D. H. Hill Arnold, of Elkins, W. Va., for defendants.

BAKER, District Judge.

This is a patent suit begun on March 28, 1933, against the Master Marble Company and four individual defendants, who are officers, directors, and owners of the majority of the stock of the defendant corporation.

Defendants moved to dismiss the bill as to the individual defendants and to strike out paragraphs 7 and 8 of the bill of complaint. These motions were overruled on July 7, 1933. The answer was filed on July 29, 1933, setting up a counterclaim asserting unfair trade practices. Plaintiff's answer to counterclaim denying any such practices was filed on August 26, 1933. Defendants on October 5, 1933, filed an amendment to their answer setting up additional prior uses and references.

This action involves on the part of plaintiff a charge of patent infringement by the corporate defendant; a charge of individual infringement by the four executives, or active officers of the defendant corporation; and a charge of conspiracy on the part of the individual defendants to create and enter into the business of manufacturing and selling marbles in competition with plaintiff. No prayer for relief based on the conspiracy.

The following is a list of the cuts considered in this opinion, and immediately following such list are the cuts of the various patents dealt with in this proceeding, which are hereby made a part of this opinion:

| Inventors | Subject-Matter | Number | Date |
|---|---|---|---|
| Early | Machine for making spherical glass bodies | 1,761,623 | 6/3/30 |
| Ayer | Globule machine | 17,865 | 7/28/57 |
| Ward | Pill machine | 311,620 | 2/3/85 |
| Forsyth | Axial rolling | 379,386 | 3/13/88 |
| Hill | Machine for rolling balls | 600,532 | 3/15/98 |
| Christensen | "      " spherical " | 802,495 | 10/24/05 |
| Hill | "      " mfg. "    bodies | 1,164,718 | 12/21/15 |
| Jenkins | "      " forming spherical bodies | 1,488,817 | 4/1/24 |
| Polster German patent | | 101,584 | 2/24/99 |
| Miller | Machine for mfg. marbles, etc. | 1,601,699 | 9/28/26 |
| Early | Machine "    " spherical glass balls | 1,761,623 | 6/3/30<br>Filed 3/22/26 |
| Early | Machine for mfg.    " bodies | 1,880,916 | 10/4/32 |
| Lynch | Traveling funnel guide for glass forming machines. | 1,531,560 | 3/31/25 |
| Bingham | Glass machine | 1,125,895 | 1/19/15 |
| Hopkinson | Process mfg. sheet glass | 1,305,286 | 6/3/19 |
| Early | Gob feeder 1932 patent | | |
| | Defendant's Stationary Gob Feeder. | | |
| Early | 1932 patent, Fig. 2 | | |
| | Defendant's Machine, Exhibit B | | |
| Hill | Machine for mfg. spherical bodies | 1,164,718 | 12/21/15 |
| Miller | | 1,601,699 | 9/28/26 |
| Freese | Apparatus for making variegated glass | 1,529,948 | 3/17/25 |
| Whittemore | Means of conveying glass to molds | 1,399,176 | 12/6/21 |
| Bingham | Glass machine | 1,125,895 | 1/19/15 |
| Blackmore | Apparatus for making glass tiling | 972,433 | 10/11/10 |
| Steimer | Glass feeding machine | 1,564,909 | 12/8/25 |
| Barber & Furner | Striped cake making machine | 660,717 | 10/30/19 |
| Copland | Nozzle for depositing machines | 651,829 | 6/19/00 |
| Scott | Duplex ladle | 1,192,467 | 7/25/16 |
| Freese patent p. 33, Fig. 5, contrasted with defendant's process | | | |
| Freese | Patent set out on pp. 33 & 47 (repeated) | | |
| Freese | "    "    "    "    "    "    "    " & 52 " | | |
| Blackmore | Apparatus for making glass tiling | 972,433 | 10/11/10 |
| Stephenson and Harrison | Production imitation onyx | 546,360 | 9/17/95 |

Pursuant to Equity Rule No. 70½ (28 U.S.C.A. following section 723), I make the following findings of fact and conclusions of law:

Findings of Fact.

*Early Patent of 1930, No. 1,761,623.*

1. The Early patent of 1930, No. 1,761,623, purports to cover a machine for the making of glass marbles:

from the beginning of the formation of each article for causing the article being formed to rotate positively about constantly changing axes, said means comprising arranging the groove on the upwardly moving roll to have a lead or offset in one direction only on the groove on the downwardly moving roll. The claimed novelty in this patent is the off-

June 3, 1930      J. F. EARLY      1,761,623

MACHINE FOR MAKING SPHERICAL GLASS BODIES

Filed March 22, 1926

This machine comprises a pair of oppositely arranged rolls having opposing helical peripheral grooves with means for simultaneously rotating said rolls upwardly and downwardly at their respective working points; and has means effective setting of one grooved roll with respect to the other. The machine otherwise is the same as that shown in Hill patent, No. 1,164,718, of December 21, 1915, which is acknowledged and referred to in this Early patent, No. 1,761,623.

H. C. HILL
MACHINE FOR MANUFACTURING SPHERICAL BODIES
Application Filed November 23, 1914

1,164,718

Patented December 21, 1915

One of the claims in issue also specifies the further limitation that the groove on the upwardly moving roll is shallower than the groove on the downwardly moving roll, and the groove on the upwardly moving roll is arranged to have a lead or offset on the groove on the downwardly moving roll. Claims 1, 4, and 5 are in issue. The now expired Hill patent referred to has been considered and found to be very limited in a crowded art in Peltier Glass Co. v. Akro-Agate Co. (C. C.A.) 33 F.(2d) 455.

2. The prior art shows that machines for making spherical articles, such as glass balls and the like, with opposed helical grooves turning in opposite directions upwardly and downwardly at their respective working points, either with or without an offset of the grooves with respect to one another for causing the articles to rotate positively about constantly changing axes, are old constructions prior to the date of application on March 22, 1926, of Early patent, No. 1,761,623. Typical patents showing these features to be old are Ayer patent, No. 17,865 of 1857; Hill patent No. 600,532, of 1898 (Figure 6); and Hill patent, No. 1,164,718 of 1915.

310

J. C. AYER

GLOBULE MACHINE

No. 17,865

Patented July 28, 1857

From
Fig.1

*Fig: 6.*

C. C. HILL

MACHINE FOR ROLLING BALLS

No. 600,532

Patented March 15, 1898

## FIG. 6.

## FIG. 7.

The offsetting of the rolls and grooves is shown in the patent to Ward, No. 311,620 of 1885; Hill, No. 600,532 of 1898 (Figure 7); Jenkins, No. 1,488,817 of 1924 (Figure 7); Polster, No. 101,- 584 of 1899; and Miller, No. 1,601,699 of 1926 (Figure 6); and in the prior use by Miller in the Nivison Weiskopf plant hereinafter referred to.

## A. F. WARD.

### PILL MACHINE.

No. 311,620.　　　　　Patented Feb. 3, 1885,

Fig. 5

Fig 7

April 1, 1924

1,488,817.

## H. M. JENKINS
## MACHINE FOR FORMING SPHERICAL BODIES
Filed November 11, 1922

Fig. 5.

Fig. 7.

**POLSTER GERMAN PATENT**

No. 101,584

February 24, 1899

*Fig. 2.*

*Fig. 8.*

*.Fig. 9.*

*Fig. 3.*

September 28, 1926

**W. J. MILLER**

1,601,699

**MACHINE FOR MANUFACTURING MARBLES AND SIMILAR ARTICLES**

Filed December 12, 1924

*Fig. 6*

*Fig. 7.*

3. The defendants' machine was fully disclosed to the court in answers to interrogatories accompanied by complete and accurate drawings. This description in answer to the interrogatories and these drawings were supplemented by an inspection by the court and by the respective parties and their witnesses of the defendants' apparatus and methods of manufacturing. The defendants' marble-making machine so disclosed consists, as shown in Defendants' Exhibits A, A-1, B, C, D, and E, of a machine in which there are opposed rolls having helical grooves, the centers of which are directly opposite to one another and are not offset. A plane running through the axes of the two rolls is diagonally disposed and not horizontally disposed, as in the Early patent, No. 1,761,623. The grooves of the lower roll are shallower and narrower than the grooves of the upper roll, which are deeper and partially overlap the lower roll on both sides. The court personally inspected this machine in the plant of the defendant in the presence of both parties, and the witnesses afterwards testified, both on behalf of the plaintiff and defendants, that the machine there so observed, which corresponds to the Defendants' Exhibit Drawings A, A-1, B, C, D, and E, did not have any offset.

UPPER GROOVED ROLLS

LOWER GROOVED ROLLS

PART OF UPPER ROLL

ROLLER GROOVES

PART OF LOWER ROLL

DEFENDANTS' EXHIBIT C
DEFENDANTS' ROLLS

The court observed steel balls, which the defendants use to align their rolls in position in the grooves between the rolls, and with an electric light behind the balls observed there was no offset or lead on one roll with respect to the other. Plaintiff's expert witness so admitted this to be a fact. (Rec. 380.) There is a slight taper that is not visible to the eye of about one thirty-second of an inch on one roll, which I find to be immaterial and not an element of the Early patent. I find the record of the defendants and the admissions of the plaintiff's expert Barker, who was present with the court at the inspection of the defendants' machine, to substantiate the foregoing. (Rec. 382–386.) The court is unable to accept the expert witness Barker's theoretical models Exhibit 17a and 17b and Exhibit 8, which were offered in evidence with his testimony and on which a ruling was reserved. I now hold that as a matter of fact such exhibits and the testimony concerning them cannot be accepted as contrary to the evidence produced by the defendants and inconsistent with the admissions of the plaintiff's expert witness Barker. These exhibits were apparently prepared by Barker, and his testimony as to them, before he had any opportunity to see and understand the defendants' machine at the time the court inspected it. He admitted they were neither like the plaintiff's patent nor defendants' construction. (Rec. 383.)

4. That the defendants' machine was independently arrived at by their own experimentation and construction; that the defendants at one time experimented with offsetting of rolls on their machine and found that the product was imperfect, and at a later time found that misadjustments of the machine by offsetting resulted in an imperfect product (Rec. 650, 651); and I find that the defendants spent some $9,000 in independent expenditure in experimenting and producing their own type of machine which is the subject of this suit. (Rec. 506, 507.)

5. That plaintiff entirely failed to show that defendants have infringed the Early patent, No. 1,761,623 of 1930, because this patent is limited to offset rolls, which defendants do not have in their machine and do not employ, while defendants proved, by witnesses and drawings which plaintiff's expert Barker admitted were correct (Rec. 379, 380, 381), and showed the court when the court visited the factories of both parties, that defendants' grooved rolls for forming glass gobs into marbles *did not have* the offset or lead feature of the grooves of the patented rolls, but that to the contrary defendants' rolls had the grooves in alignment, so that the center of the grooves on one roll at the working point was in line with the center of the grooves in the other roll, which arrangement of defendants they also established to be old and public property. See patents of Ayer, No. 17,865 of 1857; Hill, No. 600,532 of 1898, Figure 6;[1] Hill patent, No. 1,164,718 of 1915.[2] And as to the offset feature, see patents to Ward, No. 311,620 of 1885; Hill, No. 600,532 of 1898 (Fig. 7); Jenkins, No. 1,488,817 of 1924, Figure 7; Polster German patent, No. 101,584 of 1899; and Miller, No. 1,601,699 of 1926, Figure 6. (Rec. 554.)[3]

6. That defendants' experimented with marble-forming grooved rolls during a short period *before* defendants got into the commercial production of marbles; and during such short period experimented with the use of offset grooves (such as shown in Ward patent, No. 311,620; Polster German patent, No. 101,584; and Miller patent, No. 1,601,699), but found that offset grooves were not suited to the type of rolls defendants contemplated using, giving imperfect marbles, and then ended such experiments, and have not thereafter used any offset feature whatsoever, at any time, but to the contrary with defendants' rolls, any misalignment results in imperfect and unmerchantable marbles. (Rec. 650, 651.)

7. That the defense of prior use embodied in the machine known on the record as the Miller-Nivison-Weiskopf machine has been established as required by law; that said machine was built by one W. J. Miller at Swissvale, Pa.; that such machine (shown in Defendants' Exhibit Y) was constructed in 1919 and 1920; was sold and delivered in March, 1920, to the Nivison-Weiskopf Company, of Cincinnati, Ohio; that said machine was put to use by said purchaser in 1921; and that between February 19, 1921, and January, 1924 (as shown by Defendants' Exhibit Z), said purchaser and user of said

---

[1] See page 310, supra.
[2] Page 309, supra.
[3] Pages 310–313, supra.

machine manufactured on it, and sold, 854,940 marbles in 1921, 474,842 marbles in 1922, and 1,374,075 marbles in 1923, some of such marbles being in evidence as Defendants' Exhibit AA; and that said Miller took out a patent, No. 1,601,699,[4] filed December 12, 1924 (Figure 6), which shows this machine and its offset adjustment. Said machine also had means for adjusting one of the grooved rolls in an axial direction with respect to the other grooved roll; that by such adjustment the grooves in said rolls were given an offset position; and that in that position the gobs of glass were acted on by the offset feature in the manufacture of marbles on that machine. That the evidence includes original documents of dates concurrent with the building, sale, and use of said machine, and that such written and dated documents were contemporaneous with the events which led to the building, completion, and sale of the machine. (Depositions of Miller, Green, Abromats, Curtiss, Exhibits C-AA.)

*Early 1932 Patent, No. 1,880,916.*

8. The Early patent, No. 1,880,916, of October 4, 1932, comprises a pair of oppositely disposed grooved rolls with their axes in the same horizontal plane:

October 4, 1932                                1,880,916

### J. F. EARLY
### MACHINE FOR MANUFACTURING SPHERICAL BODIES
Filed May 25, 1928

Fig.2.

---

[4] See page 313, supra.

There is provided means comprising an oscillatory guide arranged with each oscillation to deposit unformed masses of glass alternately in adjacent grooves of adjacent pairs of rolls. The guide is shifted back and forth, and when so shifted is maintained in substantial registration with the groove of either of the rolls alternately so that there is a guide for receiving the charges, which guide is moved as to have its receiving end always in vertical alignment with the cut-off mechanism and is then shifted so that the discharge end is in substantial registration directly with the grooves of either pairs of rolls alternately during the delivery of alternate charges. The claims in issue are claims 2, 3, 4, 5, and 6.

9. The defendants' machine, which was inspected by the court in the presence of the respective parties with their witnesses, I find to be of the construction as shown in the answers to the interrogatories by the defendants and in defendants' drawings attached thereto, Defendants' Exhibits A, A-1, B, C,[5] D, and E. This construction consists of a stationary funnel beneath the mechanism for supplying gobs of glass. This funnel directs the gob onto a tilting tray, which is tilted back and forth to direct the gobs first into one stationary bucket and then into an opposite stationary bucket, which buckets are located over the grooves of associated rolls. The funnels and the buckets are stationary. There is no reciprocating funnel or oscillatory guide. The rolls are not in the same horizontal plane. I find no guide for receiving the glass charge with its receiving end in vertical alignment with the cut-off mechanism, which is then shifted so that the discharge end of the guide is in substantial registration directly with the grooves of either pair of rolls alternately. The plan of operation and the physical construction of the defendants are different from that' of the plaintiff in its patent No. 1,880,916. Plaintiff's expert Barker admitted the defendants' exhibits showing this were correct. (Rec. 379.)

10. That plaintiff failed on the trial to show that defendants' rolls contained the combination of features set forth in claims 2, 3, 4, 5, and 6 of the Early 1932 patent, No. 1,880,916, while defendants proved on the trial, and demonstrated to the court when he visited defendants' factory, that instead of defendants' machines embodying the combination or group of devices stated in said claims of the 1932 patent, defendants' machines, as to the devices for delivering the glass gobs to the roll grooves, were of the type and construction open to the public, because old and shown in numerous patents of prior dates: Among them, Miller patent, No. 1,601,699 of 1926; Lynch patent, No. 1,531,560 of 1925; and Bingham, No. 1,125,895 of 1915; and the Miller prior use heretofore referred to. (Exhibit KK, Book Prior Patents.)

September 28, 1926     **W. J. MILLER**     1,601,699

**MACHINE FOR MANUFACTURING MARBLES AND SIMILAR ARTICLES**

**Filed December 12, 1924**

Fig. 1

[5] See page 314, supra.

318

March 31, 1925

J. W. LYNCH

1,531,560

TRAVELING FUNNEL GUIDE FOR GLASS FORMING MACHINES

Filed April 11, 1924

Fig. 2.

A. L. BINGHAM

GLASS MACHINE

Application Filed January 14, 1910    Patented January 19, 1915

1,125,895

Fig. 6.

11. I find no infringement of Early patent, No. 1,880,916, because of the fact that in the Early patent of 1932 the axes or centers of the forming rolls are in a horizontal plane, with the result that the working portions of the rolls in said patent are also in a horizontal plane; on the other hand, in defendants' apparatus the axes or centers of the rolls are not in a horizontal plane, but in an inclined plane, which changes the relation of their working portions compared with having the axes of the rolls in a horizontal plane, which is old in the art. Furthermore, there is no oscillatory guide moving from beneath the glass depositing mechanism alternately bodily over the grooves of adjacent rolls to deposit a gob of glass. Hill patent of 1915 shows centers of rolls in a horizontal plane like in Early's 1932 patent, No. 1,880,916; and Miller's patent of 1926 shows centers of rolls in an inclined plane as in defendants' apparatus, Exhibit B, Book of Exhibits, p. 58.

**FIG. 2 OF EARLY 1932 PATENT**

**DEFENDANTS' MACHINE**
**EXHIBIT B**

General frame omitted as not material

H. C. HILL

MACHINE FOR MANUFACTURING SPHERICAL BODIES

Application Filed November 23, 1914

1,164,718

Patented December 21, 1915

WILLIAM J. MILLER

September 28, 1926

1,601,699

FIG.3.

12. That in claims 2 and 3, there is also the limitation of an oscillatory guide arranged to deposit gobs or masses of glass alternately in the adjacent grooves, while in defendants' apparatus the gobs or masses of glass are not delivered to the rolls by "an oscillatory guide," but are delivered to the rolls by stationary spouts or buckets, one for each roll; that in claims 4, 5, and 6 of the Early 1932 patent, No. 1,880,916, there are included, in each claim, a guide for receiving the gobs and "means for shifting the discharge end of said guide," to maintain the discharge end of the guide in substantial registration with the feed in either set of grooves (Early 1932 patent, No. 1,880,916, drawings); while in defendants' apparatus there is no guide with "means for shifting the discharge end" thereof to "maintain such discharge end in registration with the grooves," but to the contrary defendants' gobs are delivered to their roll-grooves through *stationary or fixed spouts,* which have no adjustment at all with respect to the rolls. (See stationary spouts of defendants in their Exhibit E, Book of Exhibits, p. 61.)

**FIG. 2 OF EARLY 1932 PATENT**

**DEFENDANTS' STATIONARY GOB FEEDERS**

DEFENDANTS' EXHIBIT "E"

13. That claims 2, 3, 4, 5, and 6 of the Early 1932 patent, No. 1,880,916, must be strictly interpreted in view of the state of the prior art, and, as so construed, are not infringed. See the patents to Miller, No. 1,601,699,[6] September 28, 1926; Lynch, No. 1,531,560,[7] March 31, 1925; Bingham, No. 1,125,895,[8] January 19, 1915; and Hill patent, No. 1,164,718,[9] December 21, 1915.

14. I find from the file-wrapper record of the application for this Early patent of 1932, No. 1,880,916, that preceding the filing of said claims 2, 3, 4, 5, and 6, there was an original claim numbered 2. This claim 2 was rejected on prior patents cited by the Patent Office examiner. Thereupon said claim 2 was canceled and these claims now in issue were substituted or later filed. Such rejected and canceled claim 2 read as follows: "2. In a machine for forming spherical bodies, the combination with a plurality of pairs of rolls arranged end to end having helical peripheral grooves for rolling bodies to spherical form, of feeding means for feeding successive charges of material and means for guiding said successive charges alternately to first one pair of rolls and then the other, substantially as described." And that plaintiff is now estopped to claim that subject-matter. (Exhibit B–4.)

15. I find as to all of these claims in issue of the Early 1932 patent, No. 1,880,916, namely, claims 2, 3, 4, 5, and 6, as follows:

Claims 2 and 3, in their present form with amendments inserted, were not before the Patent Office until January 10, 1931, over eight months after the resignation of Mr. Early from the Akro Company, May 1, 1930, and over three months after defendants began their commercial production of marbles. (Defendants' Exhibit B–4, Early File Wrapper, pp. 12, 16.)

Claims 4 and 5 were first filed in the Patent Office January 10, 1931, over eight months after the resignation of Mr. Early on May 1, 1930, and over three months after the Master Marble Company began its commercial production. (Defendants' Exhibit B–4, pp. 16, 17, 23.)

Claim 6 was not presented in the Patent Office until January 30, 1932, which was one year and nine months after the resignation of Mr. Early, and one year and three months after the Master Marble Company began commercial production. (Defendants' Exhibit B–4, p. 23.)

All of the above dates as to the origin of all of the claims were after the defendant corporation was organized on May 20, 1930, and after it had installed its machinery and embarked upon the commercial production and sale of its marbles, which were first shipped on or about October 25, 1930.

16. That the specification of the Early patent of 1932, No. 1,880,916, does not contain the following statements, found, respectively, in claims 2 and 3, to wit:

In claim 2: Grooved rolls "having the forming portions of the grooves of the pairs of said rolls in substantially the same horizontal plane * * *."

In claim 3: "The forming portions of each pair (of rolls) being in substantially the same horizontal plane * * *."

The specification is silent on these subjects and there is no foundation in fact in the specification for these statements in the claims.

*Freese Apparatus Patent No. 1,529,948.*
*Freese Method Patent No. 1,529,947.*

17. The Freese patents, Nos. 1,529,948 and 1,529,947, deal respectively with an apparatus and method of mixing clear and colored glass. They are substantially identical in drawings and specification with one another; the claims in the apparatus patent No. 1,529,948 differ from the claims of the method patent No. 1,529,947.

---

[6] See pages 317 and 320, supra.
[7] See page 318, supra.
[8] See page 318, supra.
[9] See page 320, supra.

March 17, 1925                                                                1,529,948
I. H. FREESE
APPARATUS FOR MAKING VARIEGATED GLASS
Original Filed April 15, 1922

The method claims recite the various steps in the operation of or function of the apparatus. The two patents may therefore be treated as a unit and I find that these patents disclose a main glass tank for clear glass which has one or more discharge orifices or spouts. There is located within the main tank a plurality of supplementary tanks or pots, each of which has a nozzle that is controlled. In each of these supplementary pots or tanks is molten glass of a different color, adapted to be discharged through the orifice through which the clear glass is being

discharged and within the stream of clear glass. There is an alternative form in which the supplementary pots of colored glass successively discharge upon the surface of a molten stream of clear glass, and then the several streams make their exit as a single stream. In both forms, I do not find any disclosure in the drawings or specification, as originally submitted to the Patent Office, of anything except an ordinary circular orifice for the discharge of the several streams of glass. I do not find any disclosure originally in the specification, and no showing in the drawings, of a polygonal or multi-sided form of orifice or stream of glass issuing therefrom. I find that the essence of the invention, as stated in the specification, is to inject into the center of the flowing glass stream, as it is making its exit from the flow spout, of an interiorly disposed colored stream of glass. I do not find any dumping of the colored glass as an irregular mass into the main body of clear glass. The particular development to which the inventor Freese was devoting himself was the control of the location and quantity of the colored glass continuously during its introduction into the clear glass at the point of discharge of the clear glass stream.

18. The state of the prior art shows that the introduction of colored glass into a pool of melting clear glass is old, as shown in patents Nos. 494,063 of 1893, 747,437 of 1903, and 972,433.

"CARL FRANZ EMIL GROSSE, OF BERLIN, GERMANY.

"MARBLED GLASS.

"SPECIFICATION forming part of Letters Patent No. 494,063, dated March 21, 1893.
"Application filed May 12, 1892. Serial No. 432,763. (Specimens.)

"What I claim, and desire to secure by Letters Patent of the United States, is—
"The herein described process for the manufacture of marbled or stone grained glass plates, consisting in blowing a pulverized colored glass flux upon the surface of a glass plate while said plate is in a soft condition and subsequently exposing said plate to furnace heat whereby the flux is disposed into irregularly grained or blazed figures forming an imitation of marble, granite or other stone, substantially as specified."

"WILLIAM L. KANN, OF PITTSBURG, PENNSYLVANIA.

"MANUFACTURE OF GLASS PLATES OR SHEETS.

"SPECIFICATION forming part of Letters Patent No. 747,437, dated December 22, 1903.
"Application filed December 20, 1902. Serial No. 136,035. (No model.)

"I claim—

"1. The method hereinbefore described of making a plate of glass having variegated effects and colors, which consists in melting a batch, and before the melting is finished introducing thereinto coloring-matter which sinks therein, continuing the melting of the batch and, when it is finished, pouring the same; substantially as described."

The books, Defendants' Exhibit X3, on the manufacture of marbles, entitled "Sprechsaal—Coburg," of 1914, "Glass Manufacture" of 1921, and "History of Inventions, Discoveries and Origins," by Beckman, of 1846, show that the mixing of colored and clear glass together, to give variegated colored glass results, is old. Glass marbles with clear glass exteriors, and colors within the glass or in the center of the glass, such as claimed to be produced by the Freese patents, are also old, for more than fifty years. See Defendants' Exhibit DD, the marbles in question. The discharge in separate streams of glass of different colors, and the commingling of them with the colored stream in the center, or between the bodies of clear glass at the point of discharge, is old, as shown in the Blackmore patent 972,433:

**L. R. BLACKMORE**
### APPARATUS FOR MAKING GLASS TILING
#### Application Filed October 17, 1907

**972,433**

Patented October 11, 1910

The method of making variegated glasses of different color by mixing two different glasses of different colors in a common container, and then moving them together, is shown to be old in Challinor patent 342,898, of 1896. It shows the use of separate receptacles for different colored glasses, just as Freese uses separate receptacles for different colored glasses:

"DAVID CHALLINOR OF PITTSBURG, PENN-
SYLVANIA.

"MANUFACTURE OF VARIEGATED
GLASSWARE.

"SPECIFICATION forming part of Letters Patent No. 342,898 dated
June 1, 1886

"Application filed March 24, 1886. Serial No. 196,398. (Specimens.)

"I claim herein as my invention—

"1. As an improvement in the art of producing variegated glass; the herein-described method, which consists in melting glasses of various colors; in separate receptacles; putting the desired quantity of each of such glasses in a common pot or cru-

cible; and then stirring the same together, substantially as set forth.

"2. As an improvement in the art of producing variegated glass, the herein-described method, which consists in melting glasses of various colors in separate receptacles, putting the desired quantity of each of such glasses in a common pot or crucible, stirring the same together, and then heating the mingled glasses to the proper working temperature substantially as set forth."

I therefore find as a fact that the mixing of colored glass and clear glass in a single container, or by the use of separate containers, is old and fully disclosed in the prior art. (Defendants' Exhibit KK.)

19. I have examined the answers to the interrogatories of the defendants and the drawings submitted by the defendants, showing their glass mechanism, Defendants' Exhibit F1 and F2. I have also inspected the defendants' glass making mechanism in its plant, in operation, and in the presence of opposing parties and their witnesses, and have heard the evidence and seen the exhibits of marbles resulting from the use of defendants' apparatus; considered the testimony of the

plaintiff, and the claim that the construction of its Exhibit 1A, BB, and CC was used by the defendants. I find that the use of the construction of Exhibits 1A, BB, and CC was experimental, and abandoned, and that no commercial marbles were made therefrom. (Rec. 623–627; 716–722.) However, this would make no difference, as I find no infringement, due to the fact that there are no separate pots employed by the defendants, with special controls on the colored glass pots for injecting the colored glass into the center of the outflowing stream of clear glass of the defendants, and therefore there is no infringement, because the Freese apparatus and method of multiple pots and injection in the outgoing stream is not employed. Furthermore, in defendants' construction, as commercially used, in Exhibits F1 and F2, the colored glass is thrown as an irregular mass in the clear glass tank, and none of the features of the Freese patent is employed. The defendants do not produce a polygonal stream of glass, and do not inject the colored stream within the outside, clear stream of glass. (Rec., Barker, 328–358; Israel, 698, 699; Early, 569–571; Moulton, 768, 769.)

FREESE PATENT NO. 1,529,948

Fig. 5.

DRAWINGS DEFENDANTS' MOLTEN GLASS AND FLOW TANKS

20. That in both the Freese apparatus patent and the Freese method patent *there are acknowledgments that important parts of the Freese inventions are old and in the prior art,* and are not the inventions of Freese. A part of the subject-matter thus acknowledged to be old, is:

"The structure thus far described is old and well known in the art, and further description thereof is believed to be unnecessary." (Apparatus Patent, p. 1, lines 55–72; and corresponding statement in Method Patent, p. 1, lines 59–76.)

Again: "Molten glass flows from the flow spout in the well-known manner * * *." (Apparatus Patent, p. 3, lines 51, 52; and corresponding statement in Method Patent, p. 3, lines 40–42.)

Again: "The variegated glass stream thus produced flows through the flow hole and is sheared at predetermined intervals in the usual manner. * * * The valve plug 41 controls the flow of molten glass in a manner well known in the art." (Apparatus Patent, p. 3, lines 103–106 and 108–110; and corresponding statements in Method Patent, p. 3, lines 96–100; and 101–103.)

Therefore, I find that important parts of the Freese method and apparatus pat-

ents are old and public property as declared by the patentee on the face of the patents themselves.

21. That in the Freese apparatus patent, *only body or clear glass is contained in the flow tank,* and that for the colored glasses separate vessels or pots are used as seen at 6 in Figs. 1 and 3 and seen at 38 in Fig. 5; and, further, that in this Freese apparatus patent the colored glasses, in the condition of fragments or in a molten state, *are not placed in the flow tank with the contained molten clear glass.*

22. That in this Freese apparatus patent there are definitely and separately formed "streams" of colored glass, which "streams" pass from the separate colored glass pots (6, in Figs. 1 and 3; and 38 in Fig. 5) to the discharge orifices of the forehearth (2); where also at these flow-holes the clear glass joins the colored streams to form the gobs, as in Figs. 1 and 3 of this Freese apparatus patent; or in the alternative, as seen in Fig. 5, where the clear glass, *still apart from the colored glasses,* runs out of the flow tank in stream-like formation down the inclined bottom of the forehearth (2) and is joined by two or more streams of colored glass, each "stream" from its own pot, after which the clear glass, and the colored glasses disposed essentially within it, pour through the flow-hole to form the gob; and that Freese rests his alleged invention on the *colored stream being inside the clear stream,* and the composite stream is polygonal.

23. That as the apparatus shown in the Freese apparatus patent and the apparatus shown in the Freese method patent are identical, therefore, the court finds that the *manner and means* of manipulating the clear and colored glasses, through the use of a separate receptacle for the molten clear glass and other separate vessels for the molten colored glasses, are the same manner and means in both patents.

24. That on the occasion, during the trial of this case, when I visited the marble works of the plaintiff and of defendants, and examined the marble-making apparatus in both factories, I did not find, nor was there shown to me by the plaintiff, either in plaintiff's factory, or in defendants' factory, any apparatus corresponding in structure, arrangement, and mode of operation, with these Freese patents. I, likewise, so find from the testimony. (Rec. 328–358; 698, 699; 569–571.)

25. That in defendants' apparatus, *both* the clear molten body glass, and the colored glass, or glasses, are contained in, and emanate from, the flow-tank; and that in the relatively large body of molten clear glass in the flow-tank, defendants put or dumped colored glass or glasses, in the form of lumps or in a molten state, and that the colored glass was undirected and uncontrolled, and when melted, simply settled down in the clear glass in the flow-tank; and could be put in different places in the flow-tank of clear glass. (Rec. 328–358; 698, 699; 569–571.) There was no control over the color after the colored glass was once placed in the single tank of defendants. (Rec. 571.) The *defendants' marbles show irregular colors adjacent the surface of the marbles.* (Rec. 768, 769, Exhibits HH, GG, FF.)

26. That the apparatus and method of the Freese patents, as stated in finding 21, as compared with defendants' apparatus and mode of operation, as stated in finding 24, present two different and distinct means and ways of forming molten bodies of clear and colored glasses.

27. That defendants' flow-tank, shown in the drawings, Defendants' Exhibit F1 and F2,[10] and reproduced opposite page 47 of defendants' main brief, was seen by me in defendants' works at the time the court, the officers, and counsel of plaintiff were invited to inspect defendants' factory; that it was in this flow-tank, so shown in these exhibits, that I saw the molten clear glass, and saw a workman in defendants' factory bring colored glass to this flow-tank and dump it into the body of the molten clear glass, where the colored glass melted and amalgamated, without control, with the body of the clear glass; and that the record shows that such flow-tank of defendants, Exhibits F1 and F2, are the only tanks used by the defendants in commercial production. (Answers to Interrogatories, and Rec. 328–358; 698, 699; 569–571.)

28. That the construction, mode of operation, and use of the defendants' marble-making apparatus are unlike, and different from the construction and mode

[10] See page 326, supra.

of operation of the Freese apparatus patent, No. 1,529,948,[11] as set forth in claims 1, 2, 24, and 25, because defendants do not have: (a) Means for producing two streams of glass; (b) do not have streams polygonal in cross section; and (c) do not have separate means for causing said streams to combine. In other words, they do not have two or more pots, two or more orifices, and only have an ordinary, old-fashioned port for the mixed variegated glass to run out of.

29. That the mode of operation and use of defendants' marble-making apparatus are unlike, and different from, the method of the Freese patent, No. 1,529,-947, as set forth in claims 1, 3, 7, 8, 13, and 14, because the defendants do not add molten glass in a flowing stream to another clear stream of glass, but to the contrary, dump the colored glass into a stationary pool of clear glass; because they do not have a polygonal stream, and because they do not combine two separate streams of different color.

30. That defendants do not produce in their flow-tank "streams" composed of clear and of different colored glasses; but defendants only produce bodies of clear and colored glasses, irregularly mixed and constituting gobs of the old style, or prior art gobs, in form or char-

acter; and defendants' marbles do not have the colored glass on the inside only, within the clear glass, but defendants' marbles have the colored glass on the outside and scattered all through the clear glass, irregularly. (Rec. 328–356; 698, 699; 569–571; 768, etc.)

30a. That the art and practice of making marbles, such as children use in the game of marbles, are old, and that numerous patents of various dates, many of them now expired patents, have constituted ways and means by which the art of making such marbles has become known, and generally public property. Copies of these patents are found in Defendants' Exhibit KK, a book of prior art patents, and some of these patents have been specially drawn to the attention of the court by defendants in the enlarged reproductions of these prior patent drawings, such as:

The Ayer patent of 1857.[12]
Ward patent of 1885.[13]
Hill patent of 1898.[14]
Hill patent of 1915.[15]
Jenkins patent of 1924.[16]
Polster German patent of 1899.[17]
Miller patent of 1926.[18]
Lynch patent of 1925.[19]
Bingham patent of 1915.[20]

**FREESE METHOD PATENT NO. 1,529,947**
**FROM FIG. 1**

[11] See page 323, supra.
[12] See page 310, supra.
[13] See page 311, supra.
[14] See page 310, supra.
[15] See page 320, supra.
[16] See page 312, supra.
[17] See page 313, supra.
[18] See page 313, supra.
[19] See page 318, supra.
[20] See page 318, supra.

Whittemore patent of 1921:
Blackmore patent of 1910.[21]

Steimer patent of 1925:

**1,399,176**                                    Patented December 6, 1921

## J. WHITTEMORE
### MEANS FOR CONVEYING GLASS TO MOLDS
#### Application Filed August 23, 1918

December 8, 1925 .                                    **1,564,909**

## T. O. STEIMER
### GLASS FEEDING MECHANISM
#### Original Filed February 12, 1910

---

[21] See page 325, supra.

Challinor patent of 1886 [22] on the art or method of producing variegated glass (Exhibit KK).

The Grosse patent of 1893 (same Exhibit).[23]

The Kann [24] method patent for making glass articles of variegated colors, of 1903 (same Exhibit).

These patents have had careful consideration by the Court, and have been found to be largely pertinent to, and anticipatory of, much that is embodied in the patents in suit, and which bear upon the lack of novelty and the limitations that must be given weight in restricting the scope of the patents sued on herein to essentially what they show and describe. (See the large drawings, Defendants' Exhibits Q3, O3, N3, S3, V3, J3, P3, U3, G3, I3, W3, N3, B3, E3.)

31. That the defendants' apparatus does not contain any or all of the features italicized in the following copies of claims 1, 2, 24, and 25 of the Freese apparatus patent, No. 1,529,948:

"1. An apparatus for producing variegated *glass, including means for producing two streams of glass,* of different composition, *said streams being polygonal in cross-section* and *means for causing said streams to combine.*

"2. An apparatus for producing variegated glass including *means for producing two streams of glass of different color, said streams being polygonal in cross-section* and *means for causing said streams to combine.*"

"24. An apparatus for making variegated glass articles, *including means for producing a stream of variegated glass, said stream being polygonal in cross-section,* and *means for forming glass articles from said variegated glass stream.*

"25. An apparatus for making variegated glass articles, *including means* (for) *producing a plurality of glass streams of different hue, means for causing said streams to combine, said combined stream being polygonal in cross-section and means for forming glass articles from the variegated glass stream.*"

32. That defendants' apparatus does not produce the things italicized in claims 1, 3, 7, 8, 13, and 14 of the Freese method patent, No. 1,529,947:

"1. The *method* of producing variegated glass which includes combining *molten glass of different colors in a flowing stream, said stream being polygonal in cross-section.*"

"3. The method of *producing colored glass which comprises adding a coloring substance to a stream of flowing glass,* and severing said stream into charges for molding."

"7. The method of producing variegated glass articles which consists in *providing two streams of molten glass* of different composition, *combining the two streams,* and supplying the glass thus combined to the forming devices, *said streams being polygonal in cross-section.*

"8. The method of producing variegated glass articles which consists in *providing two streams of molten glass of different hue, combining the two streams,* and supplying the glass thus combined to forming devices, said *streams being polygonal in cross-section.*"

"13. The method of producing variegated glass articles *which includes providing two streams of glass of different color, said streams being polygonal in cross-section,* and feeding said streams of different color to forming devices.

"14. The method of *producing variegated glass articles which includes providing two streams of glass of different hue,* said *streams being columnar in shape,* severing said streams into charges, and feeding said charges to forming devices."

33. That all the claims of the Freese apparatus patent and of the Freese method patent which include the element of the "streams being *polygonal* in cross section" or the element of "said streams being columnar in shape," are not in accord with Revised Statutes, §§ 4888 and 4889, nor with rules 35 and 50 of the Rules of Practice of the United States Patent Office, which require that any feature of an invention which is claimed shall be illustrated and fully shown and also described; whereas, in these patents there is no illustration of the polygonal cross-sectional shape, or columnar shape, or any shape, pertaining to the streams, nor do the specifications of these Freese patents ascribe any purpose, object, or result to the polygonal cross-sectional

---

[22] See page 325, supra.
[23] See page 324, supra.

[24] See page 324, supra.

332

shape, or the columnar shape of the streams. U.S.Rev.St. §§ 4888, 4889 (35 U.S.C.A. §§ 33, 34).

34. The file wrapper of the Freese patent, No. 1,529,947,[25] discloses the fact to be that the claims in issue were limited to polygonal cross-sectional shape of the flowing stream or the multiple streams were columnar in shape or polygonal in cross-section. (Defendants' Exhibit Y–3.) The method claims merely specify the function of the apparatus, and by the substitution of the word "apparatus" for the word "method" in the claims, they describe in detail the function and mechanism of the method patent which, as hereinafter concluded as a matter of law, invalidates these claims.

35. The file wrapper of the Freese apparatus patent, No. 1,529,948[25] shows that in the Patent Office Freese is required to restrict his claims to streams polygonal in cross section, that is, many sided. As I find in connection with the conclusions of law, there is no support in the specification as originally filed for this statement and there is no disclosure in the drawings.

*No Case Made Against Individual Defendants.*

36. That there is no pleading that Messrs. Grimmett, Early, Israel, and Moulton, or any of them, ever, in their personal capacities, committed any infringing act; and that there is no testimony adduced by plaintiff which establishes any infringing act by any or all of these individual defendants: and accordingly no case has been made against any or all of these individual so-called defendants.

*Conspiracy.*

37. That plaintiff made no case of conspiracy against the individuals, Messrs. Grimmett, Early, Israel, and Moulton; that the chief witness for plaintiff on this issue was the president of plaintiff, Mr. Gilbert C. Marsh, whose testimony I do not regard as having established any conspiracy; that the defendants, and each and all of them, testified to a state of facts which entitled them to sever their former employee relations with the plaintiff; that the general manager of the plaintiff company, by name, Mr. Wetterau, whose attitude toward, and treatment of, these several defendants, as testified to by all of them, was the primary cause for the resignations of these several defendants; and that as said Wetterau was not called as a witness by plaintiff, the record stands as made by the testimony of the four individual defendants. That the means of conducting business by the defendants was lawful and their object in entering into an independent business, which they had a right to do, was lawful. That there was no understanding, unexpressed or implied, or any agreement or intention proven that two or more of these defendants agreed or conspired to go into business together prior to leaving the plaintiff and that they left the plaintiff for other reasons, and later, after leaving the plaintiff, being without employment, they decided, as a means of livelihood, of entering into the business of making marbles; and that they independently developed their own machines and their own business without reference to the plaintiff, its machines, and its business. (Rec. 189–212; 817–823; 487–510; 536 et seq.; 416 et seq.; 749 et seq.)

*Counterclaim.*

38. The court finds that the counterclaim of the Master Marble Company, as set forth in its pleading or cross-bill, states a cause of action; and should be referred to a special master to be appointed by the court, to take, state, and report to the court the just amount the defendants are entitled to recover on the case pleaded in this counterclaim.

### Conclusions of Law.

A. That the comparison to be made by the court on infringement is between the plaintiff's patent and the defendants' construction, and the comparison is not between the plaintiff's construction and the defendants' construction of its apparatus, and likewise the comparison is between the plaintiff's method patent and defendants' apparatus and methods, and not between the plaintiff's apparatus and methods and the defendants' apparatus and methods. Harvey Hubbell, Inc., v. General Electric Co. (C.C.A.2) 267 F. 564, 569, 4th Syl. and text.

*Early 1930 Patent.*

B. That defendants do not infringe the Early patent of 1930, No. 1,761,623 (claims 1, 4, and 5), in that defendants

have not used, and do not use, the offset feature of the grooves of the rolls.

█ C. That the experimental testing by defendants of offset rolls, for a brief period before going into commercial production, in the period prior to the adoption by defendants of their commercially used rolls without grooved offsets, was not in law an act of infringement as marbles were not commercially sold. Justice Story in Sawin et al. v. Guild, 21 Fed.Cas. 554, No. 12,391; Bonsack Mach. Co. v. Underwood (C.C.E.D.N.C.) 73 F. 206.

█ D. That the proof of the prior use of said Miller-Nivison-Weiskopf machine is in accordance with the law on the proof of prior uses when set up as defense against the validity of the patents sued on; and was proved beyond a reasonable doubt that said machine constituted what in law would be an anticipation, sufficient to entirely defeat the Early patent, No. 1,761,623, and also effective as prior art to reduce the interpretation of the Early claims in his 1930 patent to their narrowest scope or aspect, and in such aspect and detail they are not infringed. Smith v. Ridgely (C.C.A.) 103 F. 875; Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; and Leader Plow Co. v. Bridgewater Plow Co. (C.C.A.4) 237 F. 376.

E. That the prior art referred to in the findings of fact invalidates the Early patent, No. 1,761,623, as showing all of the features of that patent in the same combination, and likewise that patent is anticipated by the Miller prior use; and the prior use and prior art likewise limit the patent, even if valid, to the specific construction shown and claimed, including the offset position of one roll with respect to the other, which I find the defendant does not have.

█ F. That the benefit of the doctrine of estoppel, claimed by the plaintiff against the defendants as to the validity of the claims of the several patents in suit, is a technical defense, beneficial only in equity and available only to a party who comes into court with clean hands; and as a matter of law, the conduct of the plaintiff complained of by the defendants in the counterclaim is such unclean hands on the part of the plaintiff as to deprive it of the equitable doctrine of estoppel, particularly in view of the finding of facts and the conclusions of law, that the claims as to which the doctrine of estoppel is asserted were either inserted in the main without the knowledge of the patentees or after the defendants had installed and put into operation their apparatus; and that it would be contrary to public policy to permit these invalid patents to remain as valid patents as against the public in view of the disclosures of the prior art and prior uses in this cause. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; approving Leader Plow Co. v. Bridgewater Plow Co. (C.C.A.4) 237 F. 376.

█ G. That the defendant does not infringe the Early 1932 patent, No. 1,880,-196, because the combination of that patent has not been employed by the defendant, in that they do not have rolls in the same horizontal plane and do not have the oscillatory guide operated in the manner claimed in said patent.

█ H. That this plaintiff cannot construe, or treat the claims of the Early 1932 patent, No. 1,880,196, Nos. 2, 3, 4, 5, and 6, in any manner to cover or embrace the same, or substantially the same, subject-matter that was contained in rejected and canceled claim 2, which subject-matter was dedicated to the public. Smith v. Magic City Kennel Club, 282 U.S. 784, 51 S.Ct. 291, 75 L.Ed. 707, opinion by Mr. Chief Justice Hughes; Doughnut Machine Corp. v. Joe-Lowe Corp. (C.C.A.) 67 F.(2d) 135; Crawford v. Heysinger, 123 U.S. 589, 606, 8 S.Ct. 399, 31 L.Ed. 269; Leggett v. Avery, 101 U. S. 256, 25 L.Ed. 865; Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 228, 26 L.Ed. 149; Fay v. Gordesman, 109 U.S. 408, 3 S.Ct. 236, 27 L.Ed. 979; Mahn v. Harwood, 112 U.S. 354, 359, 5 S.Ct. 174, 6 S.Ct. 451, 28 L.Ed. 665; Union Metallic Cartridge Co. v. U. S. Cartridge Co., 112 U.S. 624, 644, 5 S.Ct. 475, 28 L.Ed. 828; Sargent v. Hall Safe & Lock Co., 114 U.S. 63, 5 S.Ct. 1021, 29 L.Ed. 67; Shepard v. Carrigan, 116 U. S. 593, 6 S.Ct. 493, 29 L.Ed. 723; White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303; Sutter v. Robinson, 119 U.S. 530, 7 S.Ct. 376, 30 L.Ed. 492; Bragg v. Fitch, 121 U.S. 478, 7 S.Ct. 978, 30 L.Ed. 1008; Snow v. Lake Shore & M. S. Railway Co., 121 U.S. 617, 7 S.Ct. 1343, 30 L.Ed. 1004.

I. That plaintiff cannot maintain this action against defendants on claims 2, 3, 4, 5, and 6, or any of them, of the Early 1932 patent, No. 1,880,196, because they were filed and procured *after* defendants had embarked upon their commercial career, had devised and made, and had installed and used their apparatus, and had already manufactured and sold the resulting marbles. Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 24 L. Ed. 1053; Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 44 S. Ct. 342, 68 L.Ed. 792; Gilmer Co. v. Geisel (C.C.) 187 F. 606, affirmed in (C. C.A.) 187 F. 941; United Shoe Machinery Co. v. L. I. White Shoe Co. (D.C.) 270 F. 650, affirmed in (C.C.A.) 279 F. 35; Lopulco Systems v. Bennet Co. (C.C.A.) 24 F.(2d) 510; Hestonville, M. & F. Pass. R. Co. v. McDuffee (C.C.A.) 18 F. 798, 802; Carley v. Matthes, 56 App.D.C. 20, 6 F.(2d) 718; Dwight & Lloyd Sintering Co. v. Greenawalt (C.C.A.) 27 F.(2d) 823; Westinghouse E. & Mfg. Co. v. Jeffrey-De Witt Insulator Co. (C.C.A.) 22 F.(2d) 277; Utah Radio Products Co. v. Boudette (C.C.A.) 78 F.(2d) 793; Auto Research Corp. v. Jackson, etc., Corp. (C. C.A.) 66 F.(2d) 599; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Union Special Machine Co. v. Willcox & Gibbs, etc., Co. (D. C.) 32 F.(2d) 924.

J. That claims 2 and 3 of the Early 1932 patent are void under the decision of the Supreme Court in Permutit Co. v. Graver Corp., 284 U.S. 552, 52 S.Ct. 53, 76 L.Ed. 163, because claim 2 contains the feature of grooved rolls "having the forming portions of the grooves of the pairs of said rolls in substantially the same horizontal plane * * *," and because claim 3 includes the feature of "the forming portions of each pair (of rolls) being in substantially the same horizontal plane * * *," which features from each of these claims 2 and 3 are not found described in the specification of the 1932 Early patent; nor is any equivalent statement found in the specification of that patent.

K. That the 1932 Early patent 1,880,-916 is invalid because anticipated by the prior art patents Nos. 1,531,560 of Lynch, 1,601,699 of Miller (and prior use by Miller), 1,125,895 of Bingham, 1,305,286

of Hopkinson, and patent 1,164,718 of Hill.

*Freese Apparatus Patent No. 1,529,948.*
*Freese Method Patent No. 1,529,947.*

L. That the correct interpretation of the claimed invention of these two Freese patents is that clear glass alone, and unmixed with any other glass, forms the contents of the flow-tank; and that the colored glasses, alone, and unmixed with any other glass, form the contents of separate vessels (separate from each other, *and separate from the flow tank);* and that in both patents these separate streams are injected one into the other or separately laid one over the other, as independent streams, and consolidated into a single stream with a colored glass on the interior only of the clear glass which surrounds the colored glass.

M. That the Freese patents, apparatus, and method, and the defendants' apparatus and practice, are in a legal sense different from each other and are not in conflict one with the other; and defendant does not infringe the Freese patents because it merely dumps colored glass in a regular mass into a pool of clear glass without control of the colored glass thereafter and without the use of a separate pot full of colored glass; and for the further reason that the stream of colored glass is not wholly within the clear glass; that there are no separate streams of clear or colored glass; and that the resulting body of defendants' glass is not columnar or polygonal in cross section.

N. That the construction, use, and mode of operation of defendants' marble-making apparatus do not constitute any infringement of claims 1, 2, 24, and 25 of the Freese apparatus patent, No. 1,529,948.

O. That the use and mode of operation of defendants' marble-making apparatus do not constitute any infringement of claims 1, 3, 7, 8, 13, and 14 of the Freese method patent, No. 1,529,947.

P. That the acknowledgments in the Freese specifications of the apparatus and method patents with respect to vital parts of the Freese inventions being old and well-known, place these patents and their claims in the category of improvement patents, as distinguished from generic patents covering pioneer inventions; and

that in construing and interpreting these Freese patents and their claims in issue, this status of them must be kept in mind and adhered to as matter of law. Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, bottom 556, top 557, 24 L.Ed. 1053; Kokomo v. Kitselman, 189 U.S. 8, 9, 23 S.Ct. 521, 47 L.Ed. 689; Boyd v. Janesville Hay Tool Co., 158 U.S. 260, 262, 15 S.Ct. 837, 39 L.Ed. 973; McCormick v. Talcott, 20 How. 402, 15 L. Ed. 930.

Q. That the Freese apparatus patent, No. 1,529,948, is void with respect to claims 1, 2, 24, and 25 for want of patentable novelty in view of the prior art; particularly the patents to Whittemore, No. 1,399,176 of December 6, 1921; Bingham, No. 1,125,985 of January 19, 1915; and Blackmore, No. 972,433 of October 11, 1910.

R. That the Freese method patent, No. 1,529,947, is void with respect to claims 1, 3, 7, 8, 13, and 14, for want of patentable novelty in view of the prior art, particularly the patents to Challinor, No. 342,898 of June 1, 1886, and Blackmore, No. 972,432, of October 11, 1910, and certain prior publications, namely: "Sprechsaal-Coburg," 1914; "Glass Manufacture," of 1921; and "History of Inventions, Discoveries and Origins," 1846.

S. That claims 1, 3, 7, 8, 13, and 14 of this Freese method patent are void because they merely recite the mode of operation and results set forth in the Freese apparatus patent, No. 1,529,948.

T. That claims 1, 2, 24, and 25 of the Freese apparatus patent, and claims 1, 3, 7, 8, 13, and 14 of the Freese method patent, are all void because of the failure of the patentee to illustrate the alleged cross-sectional shape of the streams: and by later amendment to the claims secured their issue by inserting amendatory subject-matter which was not disclosed, illustrated, or described in the patent applications as originally filed.

U. That the Freese method patent, No. 1,529,947, is invalid because it merely states the function or effect of the machine. Chisholm-Ryder Company v. Buck (C.C.A.4) 65 F.(2d) 735; Demco, Inc., v. Doughnut Mach. Corp. (C.C.A.4) 62 F. (2d) 23.

V. That the burden of proving infringement is solely upon the plaintiff, and that in this case this burden of proving infringement of the several patents in suit has not been successfully carried by the plaintiff. National Mach. Corp. v. Benthall Mach. Co. (C.C.A.4) 241 F. 72; Demco, Inc., v. Doughnut Mach. Corp. (C.C.A.4) 62 F.(2d) 23, 25; and Motorfrigerator Co. v. Frigidaire Sales Corp. (C.C.A.4) 59 F.(2d) 622, 625.